

## HODGES WALSH & BURKE, LLP

ATTORNEYS AT LAW

55 CHURCH STREET, SUITE 211
WHITE PLAINS, NEW YORK 10601

(914) 385-6000
FAX (914) 385-6060
www.hwb-lawfirm.com

June 18, 2024

Honorable Philip M. Halpern          ***By ECF***
United States District Court Judge
United States District Court
300 Quarropas St.
White Plains, New York 10601

Re: *United States v. Richard Leaf* 22 CR 159

      I submit this sentencing letter on behalf of Richard Leaf who is scheduled for sentencing on July 2, 2024 before your Honor. Mr. Leaf pleaded guilty to a one count indictment. Count One charges him with knowingly receiving or distributing child pornography by means of computer in violation of Title 18 U.S.C. § 2252A(a)(2)(A). Under 2252A(a)(2)(A) there is a five-year mandatory minimum. (18 U.S.C. 2252A (b)(1). The probation recommends a sentence of 60 months as sufficient but not greater than necessary sentence for Mr. Leaf. For the reasons set forth below and for the reasons in the presentence report we agree with the probation department's recommendation.

      I have included the following reports and letters of support for the Court's consideration:

1. Reports from Ken Lau, LCSW- sex offender specific counselor Ex. A
2. Psychosexual Risk and Psychological Evaluation- Dr. Sara Liebert Ex. B
3. Letter from Richard Leaf Ex. C
4. Letter from Joan Altman- Richard's sister Ex. D
5. Letter from Dr. Jim Bostic Rev. Ex. E
6. Medical Records Dr. Raizes Scarsdale Medical Group Ex. F
7. Teacher Evaluations Ex. G
8. Letters from former teachers and parents Ex. H
9. Letters of Appreciation and Awards While Teaching Ex. I
10. Non-Teaching Awards Ex. J
11. Letter from friend Fred Valenti

## I.    Personal Background

Richard Leaf is 76 years old. He was born on March 8, 1948. He has no criminal history and has never had any contact with the criminal justice system. Other than his current charges, Richard has been a valuable member of society serving as highly regarded and well-respected teacher for the Harrison school district. He had an unblemished career for 34 years. A career which he retired from in 2004. (See, Ex. G; H & I)

He was a well-thought of member in the sports community serving and volunteered countless hours to the public as the announcer of the Iona College basketball games and served on the selection committee for the Con Ed Athlete of the Week honors. He served as a public address announcer for the girls and boys Section 1 basketball finals for over 36 years. Since 1981, Richard also served as a referee for girls and boys soccer in Westchester and Putnam Counties and served as the President of the Westchester-Putnam Approved Soccer Officials Association. In recognition of his over three decades of commitment and service to the community, he was elected to the Westchester County Sports Hall of Fame in 2017. (See, Ex. J & K)

He has one sibling a sister Joan Altman, who is two years younger. She resides in Westchester County with her husband. Richard has lived in Westchester County most of his life. (See Ex. D letter from Joan Altman) For the last 19 years he has rented a condominium at 331 A Heritage Hills, Somers, New York. He has not been married and does not have any children.

## II.    Education and Employment:

As noted above, Richard was a teacher for 34 years in Harrison School District. The attached reviews of his performance as a teacher report that Richard was an excellent educator. He consistently received the highest review of 4 on his teacher and peer evaluations. (See, Ex. G attached) The administrator class evaluator reviews found that Mr. Leaf was an "integral part of the Harrison community of learners. Mr. Leaf "was the Social Studies Chairperson and under his leadership he nurtured and developed the finest team of teachers in the Westchester Middle schools." *Id.* "As the Social Studies Chairperson, teacher, referee and other leadership roles, Mr. Leaf exemplified model citizenship for all students and staff who passed through the middle school."*Id.* In another administrator's in class review of Mr. Leaf he commented that it is "quite rare for an administrator to be afforded the opportunity to observe a lesson in which [the evaluator] becomes so enraptured by the educational experience that he desires to abandon his notepad and participate in the classroom activities during the evaluation of an educator reflected on the tremendous learning experience in Mr. Leaf's class."*Id.* Yet another review commented that Mr. Leaf was a "Master" teacher and reflected that Mr. Leaf's ability to enable students to work autonomously and cooperatively with one another"- the evaluator further wrote "Mr. Leaf is a truly gifted and innovative educator and it was a pleasure to share the joy and wonder of his instruction." Summing up one evaluation the writer commented that Mr. Leaf was an "excellent educator."

The students and parents of students also shared equal praise of Mr. Leaf calling him the "best teacher in the world" and his periods 4 and 9 being the highlight of their day. (Ex. H) As well

as numerous letters thanking him for his innovative teaching style and supervising the annual trip to Washington D.C.*Id.*

The superintendent and principal of Louis M. Klien school routine sent letters of appreciation to Mr. Leaf recognizing his dedication to the school and students. Whether it was spearheading, organizing and fundraising the three-day Washington D.C. trip for 140 to 180 students every year or the assistance in preparation for graduation or Christmas concerts Mr. Leaf was always freely volunteering his time in helping and going above and beyond. Ex. ___ attached) Mr. Leaf also was instrumental in the Holocaust presentation, the 9/11 assembly, the school career assembly, a class trip to Gettysburg and Antietem, The Harrison Day Parade, the development of the mid-term scheduling for the entire district and assuring that the students both main stream and special education students achieve 90% or higher on their standardized test scores. *Id.*

On April 11, 1994, Mr. Leaf was selected as one of the most dedicated and creative teachers in Westchester and Putnam Counties. He was also recognized at the annual principal's dinner by the Fordham Prep High School Headmaster for his role in preparing students for the rigors of High School.*Id.*

In 2001 the New York Athletic Administrators Association honored Richard for his distinguished service to athletics for his over twenty-six years of volunteering as a public address announcer and director of Westchester and Putnam referee association. (Attached Ex. ___) In 2005-2006 Richard won the National Association of Sports Public Address Announcers.*Id.* On October 19, 2017 Richard was inducted into the Westchester County Sports Hall of Fame for his near three decades of volunteering as the girls and boys public address announcer.*Id.* Similarly, in November of 2017, Richard was honored by Village of Somers Supervisor in a proclamation honoring his decades of service to the community.*Id.*

As a result of his arrest on the current case there was an article published in the Journal News reporting the crime of possession of child pornography and chatting with a minor on line. https://www.lohud.com/story/news/crime/2021/02/24/rich-leaf-child-porn-charge-westchester-sports-hall-famer/4573266001/.

Similarly, it was reported in the media about his guilty plea regarding these charges. https://www.lohud.com/story/news/local/westchester/somers/2023/07/03/rich-leaf-westchester-sports-mainstay-pleads-guilty-to-child-porn-charge/70374673007/.

During his long and distinguished career there was never a complaint, by a student, parent or co-worker that Richard ever acted inappropriately with any child. This is true even after the allegations were published in the Journal News regarding the arrest for the current offense.

## III.    Treatment:

████████████████████████

█████████████████████████████████

█████████████████████████████████



## IV.  Summary of Medical Conditions and lack of Substance Abuse History:

Another compelling characteristic in support of Mr. Leaf's sentencing request is his poor health. He is a 76-year-old Type-2 Diabetic, who suffers from a number of health conditions that in the aggregate are debilitating physically. Mr. Leaf suffers from acute liver failure, chronic kidney disease, Type -2 diabetes, coronary artery disease, hypertension and suffered a heart attack in 1998. PSR ¶¶ 67-68 (Exhibit G). Physicians prescribe him Gabpentin, Novolin R (Insulin) and Jardiance all on a daily basis to manage his blood sugar. PSR at ¶ 68. As a result of his diabetes, Mr.

Whether considered individually or in combination, Mr. Leaf's current physical and mental health create serious issues should a prolonged custodial sanction be imposed and supports the requested sentence of 60 months under § 3553(a). While Mr. Leaf had been incarcerated his health conditions have deteriorated. He has lost feeling in his foot due to type 2 diabetes and lack of appropriate medical treatment. Continuous and prolonged isolation and lock downs have prevented him from walking and exercising to increase circulation. *See, United States v. Rausch*, 570 F.Supp.2d 1295 (D. Colo. 2008) (imposing 1 day of jail and supervised release for a defendant convicted of possessing child porn in part because defendant needed dialysis and kidney transplant, while noting such a sentence was the "strongest sentence without putting his life at risk" and that defendant's "extremely poor health and complexity of his needs for medical care override any value that further imprisonment may have"); *United States v. Hein*, 463 F.Supp.2d 940 (E.D. Wisc. 2006) (explaining that where defendant convicted of being felon in possession of ammunition, the guideline term of 12 to 18 is "greater than necessary to satisfy the purposes of sentencing" in part because "defendant was in extremely poor health . . . and . . . a prison term for one in his condition

would be extremely difficult, and that the Bureau of Prisons would be strained in dealing with him").

In this same vein, and somewhat related to this issue of age and infirmity, "management problems with elderly inmates, . . . are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, need for special physical accommodations in a relatively inflexible physical environment." *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Department of Justice, National Institute of Corrections, 2004 edition, p. 9-10. These factors, too, militate for the requested sentence.

## V. **Psychosexual History and Evaluation**



## VI.    **POST ARREST REHABILITATION**



The Second Circuit has held that "an individual convicted of receiving child pornography may be entitled to a downward variance in light of his rehabilitative efforts, provided those efforts are extraordinary." *U.S. v. Barton,* 76 F.3d 499, 503 (2d. Cir. 1996) (holding "if the Court does find the [defendant's] rehabilitative efforts to be extraordinary, reducing [defendant's] sentence from fifteen months to probation would not be unreasonable."); *See US v. Shansky*, 939 F. Supp. 695 (D. Neb.1996) (holding that based upon defendant's extraordinary rehabilitative efforts, the Court will downwardly depart to a sentence of probation "in an effort to select the sentence which best fits the dictates of 18 U.S.C. § 3553(a).")

In the instant case, there is no question that Mr. Leaf has taken extraordinary steps to rehabilitate himself. He has undergone a psychiatric-forensic evaluation and an independent evaluation by an approved Southern District of New York treatment provider, he meets with his personal psychiatrist once a month, he attends weekly one-on-one psychotherapy sessions, and he attends two weekly group therapy session, one of which is sex-offender specific.

Accordingly, the Court is authorized to downwardly vary from the guidelines to a sentence of 60 based upon these extraordinary efforts Mr. Leaf has made towards rehabilitation.

**a. Mr. Leaf's present treatment is more effective than the treatment he would receive in custody with the BOP.**

As a result, Mr. Leaf may go without any kind of treatment for his mental health issues for an indefinite, extended period of time. This would only hinder Mr. Leaf's rehabilitation, which has already come so far through his own commitment and initiative to get better.

**b. Mr. Leaf's rehabilitation is strengthened through the relationships he has with his current therapists.**



**c. Imprisonment is not an appropriate place for treatment and rehabilitation.**

According to 18 USC § 3582, in determining whether to impose a term of imprisonment, the Court will consider factors set forth in 18 USC § 3553(a), "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."

"The [Sentencing] Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed education or vocational training, medical care, or other correctional treatment." See 28 USC § 994k.

There is substantial evidence that by reducing prospects of future employment, weakening family ties, and exposing less serious offenders to more serious offenders, time in prison leads to increased recidivism.[3]

---

[1] This notion is supported by "The role of the Therapeutic Alliance in Psychotherapy and Pharmacotherapy Outcome: Findings in the National Institute of Mental Health Treatment of Depression Collaborative Research Program." Krupnic, et al., The Journal of Clinical Psychology, June 1996 at http://www.focus.psychiatryonline.org/cgi/content/full/4/2/269.

[2] This article can be located at
http://data.psych.udel.edu/abelcher/Shared%20Documents/5%20Psychotherapy%20and%20Preventive%20Intervention%20%2842%29/martin,%202000.pdf.

[3] See Lynne M. Vieraitis, Tomaslav V. Kovandzic, Thomas B. Marvel, "The Criminogenic Effects of Imprisonment: Evidence from State Panel Date 1974-2002." 6 Criminology & Public Policy 589 (2007) at http://www3.intersicence.wiley.com/journal/117993456/abstract.

**d. After his incarceration the Probation Office would monitor and manage his sex offender treatment.**

The Probation Offices understands that sex offenders are not traditional offenders and that they need individualized treatment and management plans.

Kenneth Lau the SDNY's approved treatment provider and Dr. Leibert of his office has already evaluated Mr. Leaf and outlined a specific treatment program for his mental health issues. (Exhibit A & B). A sentence of 60 months with an extended duration of supervised release would allow the US Probation Office to tailor Mr. Leaf's monitoring and management plan to ensure that Mr. Leaf follows through with all aspects of Dr. Must's recommended treatment.

**e. In addition to undergoing this intense treatment plan, Mr. Leaf had been on very restrictive house-arrest for over a year and a half prior to which is a form of punishment.**

USSG §5F1.2 home detention may be imposed as a condition of probation or supervised release but only as a substitute for imprisonment. Under the post *Booker* framework if the Court determines that a sentence of imprisonment is necessary then it is urged that the Court sentence him to the one and a half year of home confinement as a substitute to incarceration.

## VII. APPLICATION OF THE 3553(a) MANDATE AND FACTORS WARRANTS A NON-GUIDELINE SENTENCE FOR AL LEAF

The challenge in this case, like all cases, is to determine a fair sentence that is sufficient but not greater than necessary. A sentence that is too lenient deprecates the seriousness of the crime and fails to promote respect for the law. At the other extreme, a sentence that is too severe is unjust and also fails to promote respect for the law.

We can start with the general agreement that crimes involving the possession, receipt and distribution of child pornography are serious. Congress has correctly found that harm to young children depicted in child pornography has "a substantial and detrimental effect on society as a whole." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587, Sec. 501(1)(A)(2006).

In the instant case, however, Defendant was not involved in the actual production of child pornography and has not sexually abused any child.[4] Further, he did not financially contribute to the production because he did not pay for such materials.

---

[4] During Leaf's post arrest interviews, he described that his interest was in the upper torso of teenage and young men's body's. His interest or fetish is confirmed by the large number of photos of young boys torsos found on his computer. The upper torso of a teenage boy does not include genitalia or depictions of sexually explicit conduct and are not considered child pornography. As to the two boys he had over his apartment, he never touched these young men's genitalia, he rubbed their chests while they slept and aroused himself.

Many defendants who access child pornography on their computer do not appreciate the magnitude of the crime being committed or the risk of getting caught. Computer technology has made this material readily available in the presumed privacy of one's home – removing substantial impediments to obtaining such material that previously existed. No longer must a person travel to some shady bookstore. Rather, there is easy availability at no cost with the click of a mouse cloaked in the anonymity and secrecy of your own home.

Two factors in this case, that are present in almost all child pornography cases – operate as enhancements to increase the Guidelines range (168 months on the low end) above the statutory mandatory minimum (60 months), even for first-time offenders: use of a computer[5] (PSR ¶ 43) and number of depictions (PSR ¶ 44)). For this reason alone, the Guidelines do not deserve controlling weight. *See Grober*, 595 F.Supp.2d 382, 397(D. N.J. 2008) (finding that many of the "offense characteristics" in § 2G2.2 are "not genuine aggravating factors" but rather are characteristics "inherent in just about any downloading offense" such that using them as enhancements is "irrational"). Rather, the more general sentencing factors set forth in 18 U.S.C. § 3553(a) trump the Guidelines.

There are a number of factors in this case which justify a downward variance from the Guidelines to a minimum of 60 months. Defendant's family characteristics (PSR ¶¶ 60-65); his post arrest rehabilitation; and he was not prosecuted as a child pornography producer; no criminal history; support expressed by his current therapist Ken Lau, as well as letters of support from life-long friends.

This is a person who has shown by his prior conduct that he is not in need of incarceration to prevent him from engaging in criminal conduct. But for this offense, his life has been a law abiding one. An individual with a lower risk of recidivism does not need a lengthy incarceration for the protection of the public.

The mandatory minimum of five years is not a proverbial "slap on the wrist," especially for someone who has never spent a day in jail and with no history of violence or assaultive conduct.

Defendant will also have life altering consequences of probation, life time sex offender registry and reporting that naturally flows from a conviction for this sex offense.

When the Court weighs these individual considerations, the Guidelines produce a sentence range that is not reflective of what the Defendant did. Therefore, it is appropriate in the exercise of discretion, to impose a downward variance.

The overriding principle of 3553(a) requires a district court to impose a sentence "sufficient, but not greater than necessary," to satisfy the four purposes of sentencing set forth in 3553(a)(2). The four purposes of sentencing set forth in 3553(a)(2) are: (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from

---

[5] The Application Notes do not indicate why obtaining images via a computer as opposed to the mail should be punished more harshly.

further crimes of the defendant and (D) to provide the defendant with the needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

The overriding principle of imposing a sentence that is sufficient *but not greater than necessary* to achieve these ends requires that the Court must also take into account 18 U.S.C. § 3582, especially when considering rehabilitation, the fourth purpose of sentencing under 3553(a)(2)(D). (emphasis supplied) 18 U.S.C. § 3582(a) states that the court, in analyzing the 3553(a), factors must recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

In determining whether the sentence is sufficient to comply with the 3553(a)(2) purposes of sentencing factors listed in § 3553(a). These factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the kinds of sentences available;
> (3) the now advisory sentencing guidelines and policy statements;
> (4) the need to avoid unwarranted sentencing disparity; and
> (5) the need to provide restitution where applicable.

None of these factors are to be given greater emphasis than another. However, all of the factors are subservient to the overriding mandate to impose a sentence not greater than necessary.

**a. 3553(a)(1) Nature of the Offense and Characteristics of the Defendant**

When analyzing the characteristics of the defendant one must read 3553(a)(1) in conjunction with 18 U.S.C. § 3661 which provides that "no limitation shall be placed on the information concerning the background character and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the court can consider a variety of factors regarding the defendant's background and character such as: his age, his mental and emotional maturity level, and educational or vocational skills. In considering those factors, Dr. Must, Richard's sex offender specific counselor, who has seen him on a weekly basis for over the past nineteen months, opines that he does not appear to be at risk to return or repeat the offending behaviors.

In addition, Richard's post arrest rehabilitation is also a compelling factor to consider. As noted above post arrest rehabilitation efforts have been taken into account by a Court when reviewing a defendant's motion for a downward variance.

**b. The sentences available (3553(a)(3)) and the need to avoid unwarranted sentencing disparity (3553(a)(6))**

The need to avoid unwarranted sentencing disparities is also a factor that can be considered where there is "disparate treatment between federal and state court sentences in similar cases." *United States v. Wilkerson*, 411 F.3d 1, 10 (1st Cir. 2005) Such is the case here. Of the seventy-seven prosecutions for possession of child pornography handled by the Westchester County

District Attorney's Office, fifty-five have resulted in non-jail dispositions. The remaining defendants have been sentenced to shock incarceration or a couple of weekends. (NY Daily News, June 29, 2004)

It would seem under the general language of 18 U.S.C. §3553(a)(6) (instructing courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct") that such a disparity could be considered under the advisory Guideline system. The Second Circuit has not foreclosed for defendants the issue of state disparity in sentencing. *See United States v. McDaniel*, 175 Fed.Appx. 456, 459 (2d Cir. 2006) (noting that the defendant's sentence was reasonable "[e]ven assuming that McDaniel is correct and the District Court could have considered" the disparity between his federal sentence and the sentence he would have received under state law).

Moreover, the deterrent purpose of sentencing will be sufficiently met by the probation department's supervisory random searches and computer monitoring to deter any further illegal activities.

The defense believes that the adjusted sentencing range of 168 to 210 months for a person with *no* criminal history is greater than necessary to reflect either the seriousness of the offense, the need for deterrence, to protect the public from further crimes of this defendant, or to provide any treatment which may be appropriate. We agree with probation that a variance to a non-guideline sentence of 60 is warranted.

This is a man who admittedly violated the law. Since committing this crime, his conduct has been everything one would hope for in a productive citizen: he has maintained a loving relationship with his family, and met his financial obligations. Rather than seeking a departure under any of the bases set forth in the Guidelines, Mr. Leaf requests the Court to review the driving factors behind how the suggested sentencing range was arrived at, whether those factors adequately address risk factors presented by this individual defendant, and to sentence Mr. Leaf accordingly.

## VIII.  The Evolution of U.S.S.G. § 2G2.2.2 Was Not the Result of the Sentencing Commission Engaging in its Institutional Role and, in this Case, Produces a Result Incompatible with 18 U.S.C. § 3553(a).

### 1.  The Flawed 2G2.2 Guideline.

Post-*Booker*, judges are invited to question whether a particular guideline properly reflects the considerations laid out in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 351, 357 (2007). Thus, a district judge may determine that a particular guideline reflects unsound judgment, does not treat defendant characteristics the proper way, or that a different sentence is appropriate regardless. *Id.* Further, judges "may vary [from the Guidelines] based *solely* on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (internal quotation marks and citations omitted) (emphasis added). Whether

a judge may draw any useful advice from a guideline depends first on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109. As described in *Rita*, the exercise of this role has two basic components: (1) reliance on empirical evidence or pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and consultation with participants in and experts on the criminal justice system. *Rita*, 551 U.S. at 34-50. Where a guideline is not based on "empirical data and national experience." It is not an abuse of a court's discretion to conclude that such a guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10; *see also Spears v. United States*, 555 U.S. 261, 265-66 (2009)("we now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines").

Congressionally directed guidelines, such as part of § 2H2.2, are just as advisory as any other guideline and therefore equally subject to policy-based variances. In *Vasquez v. United States*, 558 U.S. 1144 (2010) (Mem.), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. At 11, *Vasquez v. United States*, Nol. 09-5370 (Nov. 2009).

The Court may thus properly find that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is not subject to "closer review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50.

An increasing number of circuit courts and district courts are acknowledging the unfair and unsound nature of § 2G2.2. Indeed, in *United States v. Dorvee*, 616 F.3d 174, 184-88 (2d Cir. 2010), the Second Circuit took measure of § 2G2.2 and found it lacking. *Dorvee* not only found the sentence procedurally unreasonable, cut also went on to hold that it was substantively unreasonable as well. Id. At 180-81, 183-88. In *Dorvee*, the Court observed that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Id*. At 184. It held that the Commission failed to exercise its characteristic institutional role in developing U.S.S.G. § 2G2.2, *id*. at 188, leaving the Court ample room to conclude that the mechanically calculated range is a poor guide to the minimally sufficient sentence. As Dorvee make plain, one cannot contest the extremely influence of Congress in the development of this guideline. *Id*. At 184-86. Congress has influenced the development of the child pornography guideline to an extraordinary degree, and beginning in 2003 for the first time and the only time to date – made direct amendments to the Guidelines. *Id*. At 185. Most of the revisions to these

Guidelines were Congressionally-mandated and not the result of an empirical study. Id. At 184. Of course, Mr. Leaf agrees that it is well within Congress's purview to enact legislation addressing these issues, including by setting minimum and maximum penalties, *see e.g.,* 18 U.S.C. § 2252(b)(1), and issuing directives to the Commission. And, Mr. Leaf does not view Congress's input as an intrusion into the process. He merely notes that Congress's input is one, component of the process. When it becomes nearly the exclusive voice to which the Commission responds, however, that is a distortion of the process. This is clear in *Dorvee:* "Speaking broadly, the Commission has [] noted that "specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Dorvee,* 616 F.3d at 186 (quoting United States Sentencing Commission, <u>Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform</u>, 2004, at 36, <u>available at</u> <u>http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/table_of_contents.pdf</u> (last visited November 4, 2015).

The *Dorvee* Court suggested that one of the reasons the § 2G2.2 Guideline is unreliable, and produced a substantively unreasonable sentence in that case, is the idea that it increases a defendant's imprisonment range based on conduct inherent in the crime. *Dorvee,* 616 F.3d at 184-88 ("many of the § 2G2.2 enhancements apply in nearly all cases . . ." thus, "[a]n ordinary first-time offender is therefore likely to qualify for a sentence . . . rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction"); *see also United States v. Grober,* 595 F.Supp.2d 382, 397 (D.N.J. 2008) (holding that departure from range of 292 to 365 months to 5 years' imprisonment was appropriate based in part on testimony by government's own special agent that so-called aggravating factors at § 2G2.2 were "inherent" in the run-of-the-mill child pornography case).

Post-*Dorvee,* the Second Circuit went a bit further in *United States v. Tutty,* 612 F.3d 128 (2d Cir. 2010). In *Tutty,* the Second Circuit found plain (procedural) error in the district court's mistaken belief it could not vary from the § 2G2.2 based on policy reasons alone. In so holding, the *Tutty* Court put a name to the concern of the *Dorvee* Court cited above: "impermissible double counting."[6] Id. at 132. After citing the statistics regarding the rate of 2G2.2 enhancements in "run-of-the-mill cases,"[7] the *Tutty* Court stated that "the computer enhancement, for instance, has the flavor of impermissible double counting." Id. at 132 (citing *United States v. Volpe,* 224 F.3d 72, 76 (2d Cir. 2000)).

_____

[6] *But see United States v. Reingold,* 731 F.3d 204 (2d Cir. 2013) (holding that it was *not* impermissible double counting to enhance the defendant's offense level under § 2G2.2 for use of a computer and distribution).

[7] According to the Court at the time it decided *Dorvee,* 94.8% of offenders received the enhancement for images of victims under the age of twelve, 97.2% of offenders received the enhancement for use of a computer, and 96.6% of offenders received an enhancement based on numbers of images possessed. 616 F.3d at 186.

The plea argument in Mr. Leaf's case applies *all three* of these enhancements to his offense conduct. Without them, the adjusted offense level would be 28, which would result in a guideline range of *78 to 97 months custody.* Mr. Leaf's request for a downward variance is 18 months from this adjusted guideline range.

The Commission's characteristic institutional role is not satisfied by marching only to the drumbeat of Congress. In order to fulfill its mandate, the Commission must gather, review, assess and, if appropriate, incorporate feedback from a variety of sources, including judges. *United States v. Henderson*, 649 F.3d 955, 962-62 (9th Cir. 2011). As the following will demonstrate, the Commission failed in this regard. It ignored consistent feedback from judges that the child pornography guideline ranges were too severe, *see id.* ("[s]entencing courts have . . . expressed comment on the perceived severity of the child pornography [G]uidelines through increased below-guidelines variance and downward departure rates"), and repeatedly and steadily revised the guidelines to make them even more severe, regularly producing ranges that far exceed the mandatory minimum and, instead, encroach upon the statutory maximum. *Id.* (noting how guidelines conformed to mandatory minimum sentences).

Perhaps the best evidence that the Commission abdicated its obligation to consider judicial experience and practice may be found in data collected by the Sentencing Commission regarding: (1) the rate of downward departures and, below-range sentences in cases sentenced under §2G2.2 post-*Booker*, Exhibit A; and (2) the steady, dramatic increase in average sentence length in the pornography/prostitution category. Nearly every year since 1997, judges have granted downward departures in 24% of the 154 cases sentenced under § 2G2.2, compared with a 3.2% upward departure rate. A variable at http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/1998/table28.pdf (last visited November 4, 2015). After that, the rates steadily decreased, from 21.2% in 1999, available at http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/1999/table28.pdf (last visited November 4, 2015), to 6.25% in 2005 (two years after passage of the PROTECT Act), available at http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/2005/table28_pre.pdf (last visited November 4, 2015), but throughout much of that time period, it remained in the mid-to-high teens.

Even a departure rate in the high teens should have alerted the Commission to a significant measure of judicial dissatisfaction with the ranges. For purposes of comparison, it should be noted that the Firearms and Explosive Materials Working Group recommended changes to the firearms guidelines based on an 8.4% upward departure rate in firearms cases, compared with an overall guideline average of 3.5%. *See* U.S.S.G. Firearms and Explosive Materials Working Group Report, at 8 (Dec. 11, 190). This high rate of upward departures, plus the significant numbers of sentences imposed at the high end of the ranges, suggested to the working group "a general insufficiency of these guidelines." Id. at 10. The downward departure rate in child pornography cases, therefore, which has now reached upwards of 45%, should have alerted the Commission to extreme unwarranted severity of these guidelines.

Rather than responding by ameliorating the severity of the guidelines, the Commission repeatedly responded by increasing their severity. *See Dorvee*, 616 F.3d at 186; *Henderson*, 649 F.3d at 960-63. And the effects were dramatic. Whereas the mean sentence in the pornography/prostitution category was 29.1 months in fiscal year 1996, it was 109.6 in fiscal year 2007. Available at http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/1996/TAB-13.pdf (last visited November 4, 2015) and

http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/2007/Table13.pdf (last visited November 4, 2015).

In so doing, the Commission failed to implement an absolutely critical component of its statutory mandate. It chose, in essence, to develop guidelines that disproportionately reflected congressional wishes while ignoring judicial feedback, in the form of departures and the reasons for them, about the efficacy of those guidelines in serving the statutory purposes of sentencing. As developed, then, the guidelines represent the Commission's attention to only a portion of its mandate.

Compounding the distorted development of the guideline is the extent to which Congressional action stifled the departure numbers. As this Court is well aware, the Feeney Amendment, passed as part of the PROTECT Act in 2003, restricted the grounds for departures in child sex offenses. While the Commission was forced to abide by this congressional directive, its effect must be noted. The restrictions both contravened the feedback the Commission was receiving from judges about the efficacy of the guidelines and effectively repressed continuing feedback. Since courts were severely restricted in granting departures in these cases, the Commission would necessarily receive less feedback in the form of departures, thus artificially suggesting judicial satisfaction with the guideline ranges. The rate of departures in § 2G2.2 cases dropped from 18.4% in 2002 (before the PROTECT Act), available at http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/2002/table28.pdf (last visited November 4, 2015(, to 13.6% in 2003, 11.5% in 2004, and 6.25% in 2005. Exhibit A. After Booker, departures and below-range sentences rebounded, to 22% in 2006, and 27.2% in 2007. Id. From 2007 to 2013, the rates steadily climbed from 27.@%, to 35.&%, to 43%, to 44.45%, to 48.08%, to 48.26%, and to 49.94%. Id. In 2014, 47.02% of cases resulted in departures and below range sentences. Id. Despite the slight dip, the 2014 statistic remains one of the four highest years for below range sentences. Id.

These consistently high downward departure and variance rates should have alerted the Commission to judicial dissatisfaction with the child pornography guidelines. Alerted or not, however, the Commission continued to respond nearly exclusively to Congress, repeatedly revising the guidelines in ways that produced ever-harsher sentences. The result is a guideline structure that serves Congress's repeatedly expressed political wishes, but represents a complete abdication of the Commission's broader mandate, not only to formulate guidelines that reflect input from a variety of sources, but also to formulate guidelines that serve all of the purposes of sentencing. In light of that abdication, this Court has ample grounds for determining that the guidelines calculation n this case is not a useful guide to determining the minimally sufficient sentence.

Commentary and case law is in accord with § 2G2.2 lacking any empirical bases. In his detailed tracing of the evaluation of the child pornography Guideline, commentator Troy Stabenow showed that the Sentencing Commission consistently increased penalties for child pornography offenses without consideration of the § 3553(a) factors and without using empirical data or national experience. Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines (Jan 1. 2009). "[D]istrict courts," in fact "have repeatedly cited Stabenow's article for the proposition that the child-pornography guidelines' lack of empirical support provides sentencing judges the discretion to sentence below those guidelines

based on policy disagreements with them." *United States v. Huffstatler*, 561 F.3d 694, 697 (7th Cir. 2009). That is because Stabenow showed that child pornography Guideline has been arbitrarily increased, as the Commission has allowed its independent judgment to be co-opted by members of Congress. His research shows that "[n]ot only is this guideline not based on Commission study or expertise, [but] it is directly contrary to the Commission's original, studied approach, and to several of its subsequent recommendations and reports." *United States v. Phinney*, 599 F. Supp. 2d 1037, 1043 (E.D. Wis. 2009) (relying on the Stabenow article). "The Commission sought to persuade Congress not to make such changes but to no avail." *United States v. Hanson*, 561 F. Supp. 2d 1004, 1010 (E.D. WIs.2008). In short, "[b]ecause of congressional manipulation, this advisory guideline is not a reliable indicator of the Sentencing Commission's perspective on a fair sentence." *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1104 (N.D. Iowa 2009). Thus, the guideline is "seriously flawed and is accordingly entitled to little respect." *Phinney*, 599 F. Supp. 2d at 1041. Indeed, "the advisory guidelines . . .[are] not a reliable indicator of the Sentencing Commission's perspective on a fair sentence." *United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008).

## 2. The Sentencing Commission's 2013 Report to Congress.

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"]. The Commission explained that it complied the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under U.S.S.G. § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degree of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; id. at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6, Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323.

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers." *Id.* at viii, 8492; and some have collected material over "a series of decades" beginning in the pre-Internet

era, id. at 80. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like Lime Wire, to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." Id. at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P filesharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." Id. at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism – some of them very significant,'" id. at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." Id. at 282.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; see also id. at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." Id. at xviii, 322.

The Commission recommends that the specific offends characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

Given the history of the development of this Guideline, it appears to be an artifact of interference by Congress with the Commission's mission to implement § 3553(a) considerations, rather than due to any reflection of the exercise of the Commissions' particular area of expertise.

What the above illustrates is the problem which occurs when Congress does not allow the Commission to do the job for which it was created: careful evaluation of not only individual crimes and enhancements, but also of the overall balance of the Federal Sentencing Guidelines in light of core sentencing considerations. Congress does not regularly deal with the Guidelines, and therefore is not necessarily aware of the effect which setting specific offense characteristics have on an overall possible guideline range.

This inference is supported by the fact that the Commission did not begin providing Congress with sentencing statistics until February 10, 2005. *See* United States Sentencing Commission, Final Quarterly Data Report, Fiscal Year 2007 [Report], available online at http://www.ussc.gov/sc_cases/Quarter_Report_Final_07.pdf.

The offense level of 38 overstates the severity of the offense in this case for a variety of reasons. For instance, the offense involved the use of a computer, a specific offense enhancement mandated by Congress. However, the use in this case was not very sophisticated and directly led to the discovery of the crime. Most child pornography cases do involve the use of a computer. Given the prevalence of this characteristic, rather than being an enhancing factor, it is merely a normal factor.

His sentencing range is increased by four levels for sadistic or masochistic conduct. He didn't perpetrate this conduct. There is no evidence that he is especially interested in sadistic or masochistic sex. He had a *large* collection, a *small* portion of which contained representations which qualify as sado-masochistic. The fact of the matter is, a wide variety of conduct qualifies for this enhancement. *See e.g. United States v. Hoey*, 508 F.3d 687, 691 (1st Cir. 2007)("We agree with the many circuits which have found that images depicting the sexual penetration of young and prepubescent children by adult males represent conduct sufficiently likely to involve pain such as to support a finding that it is inherently 'sadistic' or similarly 'violent' under the terms of section 2G2.2(b)(4).") The fact that an image of a pre-pubescent minor is already accounted for in a separate specific offense characteristic would seem as if it were double-counting, if the image also qualifies for the sadistic conduct enhancement. In the context of the small number of such images in Mr. Leaf's images the four-level increase appears to be overly punitive and does not address the individual characteristics of this particular defendant. There is nothing to say that the harm in the image's "continued circulation," is not accounted for by the four-level increase imposed for a distribution offense.

Increasingly, courts appear to be coming to this same conclusion. Of the 1,025 cases sentenced under U.S.S.G. § 2G2.1 in fiscal year 2007, only 649 were sentenced within the guideline range. Of the 376 cases sentenced outside the guideline range, 25 were above the recommended range. This means that 351 cases were sentenced below the range. Of these, the vast majority, 227 were non-guideline downward departures. *See* Report at 14, Table 5. Of the 256 cases considered to be below-range sentences based on *Booker* § 3553, the median sentence imposed was 60 months, which coincidentally is the mandatory minimum for distribution offenses. *See id.* at 24, Table 24.

**c. The offense level in this case overstates the severity of the offense**

Mr. Leaf disagrees with the severity of the suggested punishment for this particular offense as a potential basis for a sentence below the suggested Guidelines range. We are in no way attempting to minimize Mr. Leaf's conduct before the Court. If it were not for him and people like him, who are the perverse audience for this material it would not be as prevalent as it is on the internet. The children who are depicted are abused and exploited in a horrific way.

He has never sexually abused his children or any other child. He possessed images. He shared images. For this conduct, the Sentencing Guidelines suggests that he should be sentenced at or near the statutory maximum for this behavior. Because the Guidelines leave *no* lee-way to account for those who may commit the same offense but have a more severe criminal history, there is something inherently wrong with the manner in which this suggested range has come to be.

**d. The offense level overstates the need to protect the public from further crime and the need for deterrence**

Mr. Leaf falls into Criminal History Category I because he has *no* prior criminal history points. He has no points because he has no prior convictions. In fact Mr. Leaf has no prior contact with the criminal justice system and his criminal history would be more aptly referred to as criminal history category "0" if there was such a category. This is an area in which the Sentencing Commission has done a bit of homework. In its 15-year report, it found that defendants who fall into Category I due to *no* prior criminal history points are the *least* likely to re-offend. *See* United States Sentencing Commission, Recidivism and the First Offender at 13-14 (May, 2004)(reflecting recidivism rate of 11.7 percent for offenders with 0 criminal history points, as opposed to a 22.6 percent rate for those with one criminal history point), available online at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf. The demographic information, including a significant work history, lack of drug use, education, and other socially beneficial traits, tend to describe those who have no criminal history points. *See id.* at 6-8. Therefore, it appears that a lengthy sentence to protect the public is not a factor that weighs against Mr. Leaf. Rather, it is one which indicates that a lengthy sentence is not necessary in this case.

As for deterrence, most people do not realize that a first offender would receive nearly a statutory maximum sentence, but would expect rather than one closer to the minimum. A sentence at or near the statutory maximum for a first offender may promote derision for the law "if the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 128 S.Ct. 586, 599 (2007). Therefore, the statutory factor of protecting the public and deterrence are undermined by imposing the sentence suggested by the Guidelines.

# IX. Abysmal Conditions of confinement at Hudson Correctional Facility

For years, the conditions in the jails that serve this District (and the Eastern District of New York) have been a major, growing, and widely understood problem. In the case of *United States v. Gustavo Chavez,* (22 CR 303) Judge Jessie Furman of this District detailed the ongoing deficiencies of federal inmates. Unfortunately, Richard Leaf has suffered from the same abysmal conditions of confinement while being housed at the Hudson County Jail for the last seven months. The dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near- perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. There are far too many cases to cite. For representative examples, however, see *United States v. Young,* No. 23-CR-475 (DLI), ECF Nos. 14-25; *United States v. Song,* No. 21-CR-89 (ARR), 2023 WL 6626151, at *1-2 (E.D.N.Y. Oct. 11, 2023); *United States v. Stewart,* No. 21- CR-42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *United States v. Boyd,* No. 21-CR-486 (SHS), 2022 WL 790771, at *2 (S.D.N.Y. Feb. 3, 2022); and *Gautier v. United States,* No. 21-CV-7198 (CM), 2021 WL 5282209, at *4 (S.D.N.Y. Nov. 10, 2021). *See also Scott v. Quay,* 338 F.R.D. 178 (E.D.N.Y. 2021); *Crespo v. Hurwitz,* No. 17-CV-6329 (RRM), 2020 WL 7021658 (E.D.N.Y. Nov. 30, 2020).

At least four inmates have died by suicide in the past three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement. *See, e.g.,* Sent'g Tr. at 19-21, *United States v. Days,* No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021), ECF No. 35 ("It is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that. I think you've suffered triply as a result I am convinced that no good would be served by keeping you incarcerated for one minute more than I am required to do by law."); Sent'g Tr. at 37, *United States v. Morgan,* No. 19-CR-209 (RMB) (S.D.N.Y. May, 5, 2020), ECF No. 90 (imposing a below-Guidelines sentences on account of the conditions of confinement among other things).

Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable. There are surely many reasons for these problems, but the one cited most often by the Government — publicly and privately, by lawyers from the U.S. Attorney's Office — is a severe staffing shortage. No doubt, there is considerable truth behind that explanation.

In the meantime, the only other way to mitigate the ongoing tragedy is to improve the ratio of correctional officers to prisoners by reducing — or at least not adding to — the prisoner population. Turning to this case, Mr. Leaf who suffers from several severe medical conditions has been continually placed in prolonged lock downs of 24 to 48 hour periods without being let out of his cell for food, recreation or medical treatment. The court should consider the abysmal conditions that Richard has to endure when fashioning an appropriate sentence.

## **CONCLUSION**

Mr. Leaf has pled guilty to possession and distribution of child pornography. He realizes that his conduct was unlawful and is not a victimless crime. He also realizes that because of his conduct he deserves punishment. However, as expressed in all of the attached submissions before this Court, with counseling and supervised release his risk to reoffend is low. He is receiving psychotherapy, medical treatment and medication that he so desperately needed.

Given Richard Leaf's recognition and acceptance of the dangers of his internet activities, the unlikelihood of recidivism, his post arrest rehabilitation, and the collateral financial impact on him and his children it is respectfully requested that, for these reasons and the other reasons set forth above, we urge the Court to sentence Mr. Leaf to a reasonable sentence of 60 months the mandatory minimum which is sufficient but not greater than necessary to address his conduct.

Dated: June 18, 2024
White Plains, New York

Respectfully submitted,

Michael K. Burke, Esq. (7554)
Hodges, Walsh & Burke LLP
55 Church St. Suite 211
White Plains, New York 10601
(914) 385-6030